IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

RICK NULPH, M.D.,

        Plaintiff,

v.

HOUSTON HEALTHCARE
SYSTEM, INC.,

        Defendant.

CIVIL ACTION FILE NO.

_____

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Rick Nulph, M.D. ("Dr. Nulph" or "Plaintiff") files this Complaint against Defendant Houston Healthcare System, Inc. ("Defendant" or "HHC") arising from HHC's retaliation against Dr. Nulph for engaging in whistleblower activity, in violation of the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd ("EMTALA") resulting in wrongful termination. In support of his claims, Dr. Nulph shows as follows:

## PARTIES, JURISDICTION, AND VENUE

1.

Dr. Nulph is an individual residing in Peach County, Georgia. He has been a medical doctor in good standing with the Georgia Composite Medical Board since

2006. From 2017 until 2021, he worked in and led the emergency department ("ED") at Perry Hospital, which is located in Perry, Houston County, Georgia.

2.

HHC is a healthcare system that operates Perry Hospital. It is a Georgia corporation with its principal place of business in Warner Robins, Houston County, Georgia. HHC is subject to the personal jurisdiction of this Court. HHC's registered agent is Charles Briscoe, and it may be served at 1601 Watson Boulevard, Warner Robins, Houston County, Georgia 31093.

3.

This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Dr. Nulph's claims involve violations of federal law.

4.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because HHC is a resident of, and a substantial part of the acts and omissions giving rise to Dr. Nulph's claims occurred in, Houston County, Georgia, which is part of this judicial district and division.

## BACKGROUND TO EMTALA AND THE OBLIGATIONS IT IMPOSES ON HOSPITAL EMERGENCY DEPARTMENTS

5.

EMTALA was enacted in response to Congress's "growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency

medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994); *see also Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C. Cir. 1991) ("The statute was designed principally to address the problem of 'patient dumping,' whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities.").

6.

The statute's purpose is two-fold: first, to ensure that all patients are provided with "an adequate first response to a medical crisis," and second, to "send a clear signal to the hospital community that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are truly in physical distress." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) (internal punctuation omitted).

7.

EMTALA provides that any hospital with an ED must provide any individual who reports to the ED requesting treatment with "an appropriate medical screening examination" to determine whether an "emergency medical condition" exists. *See* 42 U.S.C. § 1395dd(a).

8.

The hospital in question may not delay provision of an appropriate medical screening examination in order to inquire about the patient's insurance status or ability to pay. 42 U.S.C. § 1395(h). A hospital must apply its screening standards uniformly to all ED patients, regardless of whether they are insured, uninsured, indigent, or able to pay. *Brooks*, 996 F.2d at 710.

9.

An "emergency medical condition" means a condition manifesting itself by severe pain or other acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. *See* 42 U.S.C. § 1395dd(e)(1)(A).

10.

If the individual is found to be suffering from an emergency medical condition, then EMTALA requires the hospital to either (a) provide further examination and treatment within the hospital to stabilize the condition so as to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer to another facility, or (b) arrange for the transfer of the patient to another facility in accordance with 42 U.S.C. § 1395dd(c). *See* 42 U.S.C. § 1395dd(b)(1) & (e)(3)(A).

11.

As with the initial screening examination, any further examination and treatment may not be delayed so as to allow the hospital to inquire into the patient's insurance status or method of payment. 42 U.S.C. § 1395dd(h).

12.

If a hospital stabilizes a patient's emergency medical condition, EMTALA does not restrict the subsequent transfer of that patient to another facility. But, if a patient's emergency medical condition has not been stabilized, a hospital may not transfer the patient to another facility unless at least all of the following conditions are met:

(a) a written request for transfer must be made by or on behalf of the patient after the requesting person is informed of the hospital's obligations under EMTALA and the risks associated with the transfer;

(b) a physician must determine that based upon information available at the time of the transfer, the medical benefits reasonably expected from the transfer outweigh the increased risks to the patient;

(c) a certification must be signed by a physician or qualified medical person attesting to the determination described in paragraph (b) above;

(d) the transferring hospital must provide that treatment within its capacity to minimize the risk to the patient's health;

(e) the receiving facility must have the space and personnel available to treat the individual and must agree to accept the transfer and provide the individual with appropriate medical treatment;

(f) the transferring hospital must send the receiving facility all medical records available at the time of the transfer relating to the patient's emergency medical condition; and

(g) the transfer must be effected through qualified personnel and transportation equipment. *See* 42 U.S.C. § 1395dd(c).

## 13.

In the event of a negligent violation of EMTALA by a "participating hospital" that accepts Medicare payments, the statute provides that civil money penalties can be imposed against both the hospital as well as an individual physician. *See* 42 U.S.C. § 1395dd(d)(1).

## 14.

EMTALA also provides that "[a]ny individual who suffers personal harm as a direct result of" a participating hospital's violation of EMTALA "may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate." 42 U.S.C. § 1395dd(2)(A).

15.

EMTALA contains a whistleblower protection clause, which forbids a participating hospital from penalizing or taking any adverse action against a physician who refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized, or against any hospital employee because the employee reports a violation of a requirement of EMTALA. 42 U.S.C. § 1395dd(i).

16.

Although certain EMTALA penalties and protections apply only to "participating hospitals" that accept Medicare payments, EMTALA's requirements for screening patients, stabilizing patients, and restricting the transfer of unstabilized patients are applicable to all patients, not just Medicare patients.

## FACTS RELEVANT TO ALL CLAIMS

### *Dr. Nulph's Work at Perry Hospital*

17.

Between September 2017 and June 2021, Dr. Nulph served as an ED physician and the ED Director at Perry Hospital.

18.

Perry Hospital is owned and operated by HHC and is a "participating hospital" for purposes of EMTALA because it accepts Medicare payments.

19.

Dr. Nulph worked at Perry Hospital through a placement by Houston County Emergency Group, LLC, which upon information and belief is a wholly owned subsidiary of ApolloMD. (Throughout this Complaint, Houston County Emergency Group and ApolloMD are jointly referred to as "ApolloMD.")

20.

ApolloMD contracted with HHC to provide outsourced physicians to provide ED services to patients. HHC was not a party to or a third-party beneficiary of the contract between Dr. Nulph and ApolloMD.

21.

Dr. Nulph successfully carried out his job duties as an ED physician and ED Director at Perry Hospital and was a highly respected physician and member of the community at large.

### Perry Hospital's "City Call" Practices Generally

22.

At Perry Hospital, a "city call" patient is one who does not have an existing relationship with a physician who has privileges at the hospital. As such, doctors from the community who do have privileges will work "city call" shifts to care for these patients.

23.

Most "city call" patients are uninsured and lack the financial means to pay for medical expenses out of pocket. It is common that the hospital may not compensated for caring for these patients.

24.

Many of these "city call" patients are very ill by virtue of not receiving regular medical care or routine preventative treatment, and they therefore can require a significant amount of medical care, time, and resources from a medical provider.

25.

Perry Hospital and HHC incur significant expenses as a result of caring for "city call" patients, because they must pay ApolloMD, local physicians, or other third parties to secure "city call" coverage in Perry Hospital's emergency department.

### *Perry Hospital Suspends All "City Call" Admissions and Engages in Patient-Dumping Driven by Improper Economic Motives*

26.

By the spring of 2021, HHC's executive leadership, including its President and CEO Charles Briscoe, had grown tired of paying out-of-pocket for local doctors or groups like ApolloMD to cover this unprofitable "city call" work at Perry Hospital.

27.

Upon information and belief, Mr. Briscoe believed that reducing the expenses associated with "city call" coverage at Perry Hospital would help boost HHC's profits and possibly make HHC a more appealing target for acquisition by a larger healthcare system.

28.

In May 2021, HHC put into place a policy that, for at least the ten-day period between May 22 and June 1, 2021, all "city call" patients who reported to Perry Hospital's emergency department were to be treated differently than non "city call" patients.

29.

Even if a physician deemed admission necessary, the "city call" patients were not to be admitted to Perry Hospital, but instead were being forced to be transferred to other, larger medical facilities, including Houston Medical Center in Warner Robins.

30.

Houston Medical Center is located approximately 15 miles and approximately 30 minutes (without delays caused by traffic or construction) away from Perry Hospital. It is a larger medical facility than Perry Hospital, with approximately five times the number of beds, a larger medical staff, and a more

robustly staffed ED. Thus, Houston Medical Center is better equipped to absorb the financial hit of providing uncompensated medical care to indigent and uninsured patients, and HHC has to incur less out-of-pocket expenses to ensure that the Houston Medical Center ED is fully staffed and able to care for "city call" patients.

31.

These transfers away from Perry Hospital were to be made as a blanket policy applicable to all "city call" patients. Once the determination was made that a "city call" patient required admission, that patient was to be immediately transferred to another hospital. There was no exception for "city call" patients suffering from an emergency medical condition that had not been stabilized. There was no exception for "city call" patients whose conditions might materially deteriorate as a result of or during the transfer elsewhere. The only exception was that if the receiving facility had no beds available, then the patient would be held at Perry Hospital's ED until a bed became available at the receiving facility.

32.

If a "city call" patient refused to consent to a transfer, the patient was to be discharged with a notation in their medical records that they left against medical advice. This, too, was intended as an end-run around EMTALA.

33.

"City call" patients were transferred away from Perry Hospital in violation of EMTALA's requirements for screening, stabilizing, and transferring patients.

34.

The transfer of these patients to other facilities was not based on the certification of a physician or qualified person that the reasonably expected medical benefits outweigh the increased risks to the patient.

35.

The transfer of these patients to other facilities was not based on any request for transfer made by or on behalf of the patient.

36.

The transfer of these patients to other facilities was not based on any analysis of whether, based on the patient's individualized medical needs, the receiving facility was in a better position to care for the patient than Perry Hospital.

37.

The transfer of these patients to other facilities was not based on Perry Hospital's inability to house or provide medical care to these patients.

38.

The transfer of these patients to other facilities was not based on an assessment of whether a material deterioration in the patient's condition(s) might occur as a result of or during the transfer to the receiving hospital.

39.

The transfer of these "city call" patients to other facilities was driven by purely economic motives, including HHC's knowledge that most if not all "city call" patients are uninsured and unable to pay for the costs of medical treatment, the concern on the part of HHC's leadership about the expenses associated with treating "city call" patients at Perry Hospital, and the desire on the part of HHC's leadership to make Perry Hospital appear as profitable as possible on paper, even at the expense of patient care.

40.

By transferring these "city call" patients to other facilities other than in accordance with EMTALA's provisions, HHC engaged in the dumping of patients based on an actual or perceived inability to pay and other improper economic motives, which is precisely what Congress sought to eliminate through its enactment of EMTALA.

41.

This unlawful policy was devised by HHC's executive leadership—including its President and CEO Charles Briscoe, its COO Mindy Hartley, and its Chief Medical Officer Larry Stewart—as a means of saving HHC money, decreasing HHC's expenses, and increasing HHC's profits.

42.

The unlawful policy was communicated to Perry Hospital's ED staff through Director of Nursing April Albrighton and ED Nurse Manager Chris Hobbs, who sent e-mails and even plastered the emergency department with written notices about the policy, as shown below:







43.

Dr. Nulph was Director of Perry Hospital's ED, but he was not consulted about the implementation of this policy, was not given meaningful advanced notice that this policy was being implemented, and did not create or support this policy. In fact he actively opposed it.

44.

When Dr. Nulph learned that HHC was implementing this policy mandating the transfer of "city call" patients elsewhere, he drew on his training, education, and experience as an ED physician and came to the opinion that this policy would necessarily result in numerous EMTALA violations.

45.

When the policy did in fact go into place, Dr. Nulph witnessed multiple patients, including uninsured and indigent patients, who were suffering from "emergency medical conditions" being transferred from Perry Hospital to other facilities in a manner that he reasonably and in good faith believed did not comply with EMTALA's provisions.

46.

Dr. Nulph reported these violations internally, including by speaking to Perry Hospital's Chief of Staff (Dr. Appavuchetty Soundappan) and HHC's Chief Medical Officer (Dr. Larry Stewart). Dr. Soundappan shared Dr. Nulph's concerns

but ultimately lacked the power to stop the violations, since the policy emanated from HHC's leadership. Dr. Stewart, on the other hand, was dismissive of Dr. Nulph's objections and instructed Dr. Nulph to implement the policy as planned. Mindy Hartley also instructed Dr. Nulph that these "city call" patients were to be transferred to other facilities in accordance with this policy.

47.

Dr. Nulph was concerned that this policy prioritized profits over patients, feared that this policy continuing in effect would cause serious harm to patients who were being inappropriately transferred, and worried that as ED Director, he could be exposed to personal liability for any violations resulting from this policy that he did not design or support. Therefore, once nobody within HHC was willing or able to resolve the problem, Dr. Nulph decided to "blow the whistle" externally.

48.

On the morning of May 24, 2021, Dr. Nulph filed a formal complaint through an online portal maintained by the Office of Inspector General ("OIG") for the Department of Health and Human Services ("HHS"), the federal agency tasked with enforcing EMTALA. Dr. Nulph reported that Perry Hospital had enacted this policy, and that as a result of it, multiple uninsured patients had been transferred out of Perry Hospital in violation of EMTALA's provisions.

49.

Dr. Nulph told Dr. Soundappan that he had filed this complaint with the OIG. Upon information and belief, Dr. Soundappan promptly notified Mr. Briscoe, Dr. Stewart, and other members of HHC's executive leadership team that Dr. Nulph had filed this whistleblower complaint.

50.

HHC became aware that Dr. Nulph had filed his complaint with the OIG on the same day that complaint was filed: May 24, 2021.

51.

The very next day, Dr. Nulph was informed by ApolloMD that "the shit [was] hitting the fan" at Perry Hospital and that Mr. Briscoe wanted Dr. Nulph out of the hospital.

52.

Dr. Nulph immediately was removed from his position as ED Director, had all of his shifts taken away from him, and had his access to patient charts and other hospital information revoked.

53.

The decision to remove Dr. Nulph as ED Director and to forbid him from working any further shifts at the Perry Hospital ED was an adverse action made by HHC in retaliation for Dr. Nulph's whistleblower activity.

54.

HHC (upon information and belief through Mr. Briscoe) also made retaliatory and unreasonable demands that ApolloMD terminate its agreement with Dr. Nulph, which it did because of HHC's insistence.

## COUNT I: VIOLATION OF EMTALA'S WHISTLEBLOWER PROTECTIONS CLAUSE (42 U.S.C. § 1395dd(i))

55.

Dr. Nulph hereby incorporates all preceding paragraphs as if each said paragraph were restated herein.

56.

EMTALA's whistleblower protections clause provides:

A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

42 U.S.C. § 1395dd(i).

57.

Perry Hospital is a "participating hospital" under EMTALA.

58.

Dr. Nulph was a physician and ED director at Perry Hospital who made it known that he would refuse to authorize the transfer of any "city call" patient with an unstabilized emergency medical condition.

59.

As a physician who provided medical care at Perry Hospital, supervised Perry Hospital's emergency department, and maintained admitting privileges at Perry Hospital, Dr. Nulph is also deemed a "hospital employee" for purposes of EMTALA's whistleblower protections clause, notwithstanding his contractual relationship with ApolloMD and the fact that Perry Hospital and HHC did not pay Dr. Nulph W-2 wages.

60.

HHC, in its capacity as the owner and operator of Perry Hospital, penalized and took adverse action Dr. Nulph in retaliation for reporting of EMTALA violations by causing Perry Hospital to remove Dr. Nulph from the schedule, remove him from his position as ED Director, eliminate his access to patient charts and records, and cease paying him. These actions were taken immediately after HHC learned of Dr. Nulph's external complaint to HHS, and very soon after Dr. Nulph's internal complaints, and were motivated by Dr. Nulph's complaints.

61.

HHC never proffered any non-retaliatory reason for terminating Dr. Nulph's employment. Dr. Nulph was satisfactorily performing his job duties up to the date of his termination and had never been made aware of any performance problems. Any purported reason offered by HHC now to justify Dr. Nulph's termination is pretextual. HHC's real motivation with respect to the adverse actions taken against Dr. Nulph was retaliation for his whistleblower activity.

62.

Dr. Nulph is an individual who has suffered personal harm as a direct result of a participating hospital's violation of EMTALA. He has suffered lost wages and other financial losses, harm to his professional career and reputation, inconvenience associated with his attempts to secure replacement employment, emotional distress, mental anguish, and other pecuniary and non-pecuniary harms to be proven at trial.

63.

HHC is liable for all damages proximately resulting from its retaliation against Dr. Nulph, in an amount to be determined by the enlightened conscience of the jury, as well as punitive damages.

64.

HHC's actions were taken with knowledge and for the purpose of depriving Dr. Nulph of certain contemplated benefits, thereby entitling Dr. Nulph to recover even those damages which are traceable to, but not the legal and natural consequence of, HHC's actions. O.C.G.A. §§ 51-12-9 & -10.

65.

HHC's actions were willful, wanton, knowing, and malicious; taken in reckless disregard of Dr. Nulph's rights and HHC's obligations under federal and State law; and taken with the specific intent to cause harm to Dr. Nulph, entitling Dr. Nulph to recover punitive damages in an amount sufficient to penalize HHC for its misconduct in this case and deter similar misconduct in the future.

## COUNT II: BREACH OF LEGAL DUTY
### (O.C.G.A. § 51-1-6)

66.

Dr. Nulph hereby incorporates all preceding paragraphs as if each said paragraph were restated herein.

67.

As a hospital that accepts Medicare payments, Perry Hospital and HHC owed a duty to Dr. Nulph to comply with EMTALA, to allow Dr. Nulph (as Director of Perry Hospital's ED) to facilitate EMTALA compliance, and to refrain from retaliating against Dr. Nulph for his whistleblowing activity under EMTALA.

68.

HHC breached the aforementioned duties owed to Dr. Nulph when, in retaliation for his legally protected whistleblower activity, it expelled him from the hospital and demanded that ApolloMD acquiesce in that decision.

69.

In dealing with Dr. Nulph and making demands on ApolloMD, HHC owed a duty to Dr. Nulph to comply with its bylaws, rules, regulations, and policies, and to refrain from arbitrarily and capriciously depriving Dr. Nulph of the right to practice at Perry Hospital.

70.

Upon information and belief, HHC's bylaws, rules, regulations, and policies that were in place at the time of Dr. Nulph's whistleblowing activity and his subsequent termination prohibited terminating a physician who voiced concerns about violations of federal law.

71.

HHC's conduct was unreasonable, arbitrary, capricious, retaliatory, and unlawful.

72.

Under O.C.G.A. § 51-1-6, HHC is liable to Dr. Nulph for these breaches in an amount to be proven at trial.

73.

HHC is liable for all damages proximately resulting from its unlawful conduct, in an amount to be determined by the enlightened conscience of the jury, as well as punitive damages.

74.

HHC's actions were taken with knowledge and for the purpose of depriving Dr. Nulph of certain contemplated benefits, thereby entitling Dr. Nulph to recover even those damages which are traceable to, but not necessarily the legal and natural consequence of, HHC's actions. O.C.G.A. §§ 51-12-9 & -10.

75.

HHC's actions were willful, wanton, knowing, and malicious; taken in reckless disregard of Dr. Nulph's rights and HHC's obligations under federal and State law; and taken with the specific intent to cause harm to Dr. Nulph, entitling Dr. Nulph to recover punitive damages in an amount sufficient to penalize HHC for its misconduct in this case and deter similar misconduct in the future.

## COUNT III: ATTORNEYS' FEES AND EXPENSES
### (O.C.G.A. § 13-6-11)

76.

Dr. Nulph hereby incorporates all preceding paragraphs as if each said paragraph were restated herein.

77.

HHC has acted in bad faith toward Dr. Nulph as alleged in this Complaint, including by disregarding Dr. Nulph's complaints regarding EMTALA violations, unlawfully retaliating against him for protected whistleblower activity, insisting that ApolloMD terminate its agreement with Dr. Nulph, and otherwise.

78.

HHC has also been stubbornly litigious and caused Dr. Nulph unnecessary trouble and expense. Despite Dr. Nulph's best pre-suit efforts to resolve this matter without litigation, HHC has refused to engage in any meaningful dialogue with Dr. Nulph and undersigned counsel.

79.

HHC's bad faith, stubborn litigiousness, and conduct causing Dr. Nulph unnecessary trouble and expense entitles Dr. Nulph to recover his attorneys' fees and expenses of litigation under O.C.G.A. § 13-6-11, in an amount to be proven at trial.

**WHEREFORE**, Dr. Nulph respectfully requests the following relief:

1)      That a trial by jury had on all issues for which a jury trial is permitted under law;

2)      That damages be awarded against HHC to compensate Dr. Nulph for the injuries suffered as a consequences of HHC's actions, in an amount to be determined by the enlightened conscience of the jury;

3)      That punitive damages be awarded against HHC to punish it for its conduct against Dr. Nulph and discourage similar misconduct in the future;

4)      That appropriate equitable relief be awarded to Dr. Nulph;

5)      That attorneys' fees and costs of litigation be awarded to Dr. Nulph;

6)      That Dr. Nulph be awarded pre- and post-judgment interest at the maximum rates allowable by law; and

7)      That the Court award such other relief as it deems necessary, appropriate, just, or proper.

Respectfully submitted this 19th day of November, 2021.

*/s/ Jennifer K. Coalson*

Jennifer K. Coalson
Georgia Bar No. 266989
jcoalson@pcwlawfirm.com
Robert J. Kozloski, III
Georgia Bar No. 548519
rkozloski@pcwlawfirm.com
*Counsel for Plaintiff Dr. Nulph*
PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, GA  30309
(404) 873-8000 (Telephone)
(404) 873-8050 (Fax)

David B. Ricks, Esq.
Georgia Bar No. 167205
dbricks80@hotmail.com
DAVID RICKS, ATTORNEY AT LAW
27 Pierce Est.
Hawkinsville, GA 31036
(229) 292-0525 (Telephone)

*Counsel for Plaintiff*