## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| **RICK NULPH, M.D.,** | |
| Plaintiff, | |
| v. | Civil Action File<br>No.: 5:21-cv-00423-MTT |
| **HOUSTON HEALTHCARE SYSTEM, INC.,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## DEFENDANT HOUSTON HEALTHCARE SYSTEM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

I.      INTRODUCTION ........................................................................5

II.     BACKGROUND FACTS................................................................6

     A.      EMTALA and the Obligations it Imposes on Hospital
         Emergency Departments .................................................6

     B.      Dr. Nulph's Work at Perry Hospital ..................................10

     C.      HHC's "City Call" Policy ................................................11

III.    LEGAL STANDARDS ................................................................14

     A.      Standard Governing a Motion to Dismiss Pursuant to Rule
         12(b)(6)........................................................................14

     B.      Standard Governing EMTALA's Whistleblower Protection
         Clause ........................................................................16

IV.     ARGUMENT................................................................................18

     A.      Dr. Nulph's Complaint Fails to Sufficiently Allege How HHC's
         "City Call" Policy Violated 42 U.S.C. § 1395dd ..............18

     B.      Dr. Nulph is Not Entitled to Relief Under 42 U.S.C. §
         1395dd(i) ......................................................................20

     C.      Dr. Nulph's Complaint Should Be Dismissed with Prejudice............17

V.      CONCLUSION.............................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Cardiovascular Systems, Inc. v. Scimed Life Sciences
Systems, Inc.*,
  988 F.2d 1157 (Fed. Cir. 1993) ........................................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................10, 13, 16

*Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) ...........5

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................4, 10, 12, 16

*Bradley v. Chiron Corp.*,
  136 F.3d 1317 (Fed. Cir. 1998) ........................................................11

*Brooks v. Maryland General Hosp. Inc.*, 996 F.2d 708 (4th Cir. 1993)...................5

*City of Buford v. Ward, 212 Ga. App. 752, 755, 443 S.E.2d 279 (1994)*
  ......................................................................................................17

*David v. BayCare Health Systems, Inc.*, 2019 WL 6842085 (M.D.
  Florida, Tampa Division, 2019) .......................................12, 13, 15, 16

*Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) ................13, 16

*Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 858, 593 (3d
  Cir. 2018) ................................................................................12, 15

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012) ........................................................11

*Jairath v. Dyer, 972 F. Supp. 1461, 1465 (N.D. Ga. 1997)* ...................16

*Kizzire v Baptist Health System Inc., 441 F.3d 1306, 1310 (11th Cir.
  2006)* ........................................................................................ 14

*Parris v. State Farm Mut. Auto. Ins. Co.*, 229 Ga. App. 522, 524, 494
   S.E.2d 244 (1997) ................................................................................16

*Port Authority of New York and New Jersey v. Arcadian Corp.*,
   189 F.3d 305 (3d Cir. 1999) ................................................................11

*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994) .........................5

*Rehfeldt v. Compassionate Care Hospice Group et al.* (M.D. Georgia,
   Macon Division, 2021) ........................................................................17

*Sinaltrainal v. Coca-Cola Co.*,
   578 F.3d 1252 (11th Cir. 2009) ............................................................11

**Statutes**

31 U.S.C. § 3730(h) ..............................................................................17

42 U.S.C. § 1395dd ...............................................................................4

42 U.S.C. § 1395dd(a) ...........................................................................5

42 U.S.C. § 1395dd(b)(1) .......................................................................6

42 U.S.C. § 1395dd(c) ...........................................................................6

42 U.S.C. § 1395dd(d)(1) .......................................................................6

42 U.S.C. § 1395dd(d)(2)(A) ................................................................7,13

42 U.S.C. § 1395dd(e)(3)(A) ..................................................................6

42 U.S.C. § 1395dd(h) .........................................................................5,6

42 U.S.C. § 1395dd(i) .............................................................4, 7,12,13,14,15,17

**Other Authorities**

Fed. R. Civ. P. 8(a)(2) ..........................................................................10,16

Fed. R. Civ. P. 12(b)(6) ..........................................................................4, 10, 11, 17

O.C.G.A. § 51-1-6..............................................................................................4, 16

## I.     INTRODUCTION

Plaintiff Rick Nulph, M.D. ("Dr. Nulph" or "Plaintiff") has sued Defendant Houston Healthcare System, Inc. ("HHC") for wrongful termination after HHC allegedly retaliated against him in violation of the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). Specifically, the complaint alleges that HHC retaliated against Dr. Nulph for engaging in "whistleblower activity" after Dr. Nulph filed a complaint with the Office of Inspector General ("OIG") for the Department of Health and Human Services ("HHS") regarding HHC's "city call" policy that was in effect at Perry Hospital between May 22 and June 1, 2021. (See Generally Count I).

Dr. Nulph also contends that he is entitled to relief under O.C.G.A. § 51-1-6 for HHC's alleged violation of EMTALA's whistleblower protections. (See Generally Complaint, Count II).

The complaint fails, however, to sufficiently allege *how* HHC's "city call" policy, relating to the transfer of patients from Perry Hospital to larger and better equipped hospitals, including nearby Houston Medical Center, between May 22 and June 1, 2021, violated EMTALA. Even if the complaint had sufficiently alleged such a violation, the plaintiff is not entitled to relief under 42 U.S.C. § 1395dd(i), EMTALA's whistleblower protection clause, as alleged in the complaint.

Therefore, Dr. Nulph's complaint is not "plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and should be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.  BACKGROUND FACTS

### A.  EMTALA and the Obligations it Imposes on Hospital Emergency Departments

The complaint relies heavily on the background to EMTALA and the obligations it imposes on hospital emergency departments to bolster the plaintiff's claim for relief without describing how HHC violated EMTALA. There is no contention in this case that any patients were improperly screened, stabilized or transferred in violation of EMTALA.

EMTALA was enacted in response to Congress's "growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized." Complaint, ¶ 5, *citing Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994). The statute's purpose is two-fold: first, to ensure that all patients are provided with "an adequate first response to a medical crisis," and second, to "send a clear signal to the hospital community that all Americans, regardless of wealth or status, should know that a hospital *will provide what services*

*it can* when they are truly in physical distress." Complaint, ¶ 5, *citing Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 880 (4th Cir. 1992) (internal punctuation omitted) (emphasis added).

EMTALA provides that any hospital with an emergency department ("ED") must provide any individual who reports to the ED requesting treatment with "an appropriate medical screening examination" to determine whether an "emergency medical condition" exists. Complaint, ¶ 7, *quoting* 42 U.S.C. § 1395dd(a). The hospital in question may not delay provision of an appropriate medical screening examination in order to inquire about the patient's insurance status or ability to pay. 42 U.S.C. § 1395dd(h). A hospital must also apply its screening standards uniformly to all ED patients, regardless of whether they are insured, uninsured, indigent, or able to pay. Complaint, ¶ 8, *citing Brooks v. Maryland General Hosp. Inc.*, 996 F.2d 708, 710 (4th Cir. 1993).

If the individual is found to be suffering from an "emergency medical condition," defined as: (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in— (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who is having contractions— (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child, EMTALA requires the hospital to either (a) provide further examination and treatment within the hospital to stabilize the condition so as to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer to another facility, or (b) arrange for the transfer of the patient to another facility in accordance with 42 U.S.C. § 1395dd(c). Complaint, ¶ 10; 42 U.S.C. § 1395dd(b)(1) & (e)(3)(A). As with the initial screening examination, any further examination and treatment may not be delayed so as to allow the hospital to inquire into the patient's insurance status or method of payment. Complaint, ¶ 11; 42 U.S.C. § 1395dd(h).

Transfer is not prohibited by EMTALA. If a hospital stabilizes a patient's emergency medical condition, EMTALA does *not* restrict the subsequent transfer of that patient to another facility (nor does the complaint allege that any patient in Perry Hospital's ED had not been stabilized before being transferred). If a patient's emergency medical condition has not been stabilized, however, a hospital may not transfer the patient to another facility except under circumstances not applicable here.

In the event of a violation of EMTALA by a "participating hospital" that accepts Medicare payments, the statute provides that civil money penalties can be imposed against both the hospital as well as an individual physician. Complaint, ¶ 13; 42 U.S.C. § 1395dd(d)(1). EMTALA also provides that "[a]ny individual who suffers personal harm as a direct result of" a participating hospital's violation of EMTALA "may, in a civil action against the participating hospital, obtain those damages available for *personal injury* under the law of the State in which the hospital is located, and such equitable relief as is appropriate." Complaint, ¶ 14; 42 U.S.C. § 1395dd(d)(2)(A) (emphasis added). These provisions provide civil remedies for patients who suffer personal harm from EMTALA violations.

### 1.    The Whistleblower Protection of EMTALA

EMTALA contains a whistleblower protection clause which forbids a participating hospital from penalizing or taking any adverse action against:

- *a physician* who refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized, or

- against any *hospital employee* because the employee reports a violation of a requirement of EMTALA.

Complaint, ¶ 15; 42 U.S.C. § 1395dd(i) (emphasis added). The EMTALA whistleblower protections apply to two types of whistleblowers, physicians, and

hospital employees.

**B.      Dr. Nulph's Work at Perry Hospital**

The complaint outlines Dr. Nulph's work at Perry Hospital but mistakenly characterizes the plaintiff's employment relationship with HHC. He was not an employee of HHC.

Between September 2017 and June 2021, Dr. Nulph was an ED physician at Perry Hospital and served as the hospital's ED Director. Complaint, ¶ 17. Perry Hospital is owned and operated by HHC and is a "participating hospital" for purposes of EMTALA because it accepts Medicare patients. Complaint, ¶ 18. Dr. Nulph worked at Perry Hospital through a placement by Houston County Emergency Group, LLC, a wholly owned subsidiary of ApolloMD. Complaint, ¶ 19.

Specifically, ApolloMD contracted with HHC to provide *outsourced physicians* to provide ED services to patients. HHC was *not* a party to or a third-party beneficiary of the contract between Dr. Nulph and ApolloMD. Complaint, ¶ 20. Importantly, Dr. Nulph had signed an employment contract with ApolloMD only, not HHC, and neither HHC nor Perry Hospital paid Dr. Nulph's W-2 wages. Complaint, ¶ 59. Consequently, ApolloMD, not HHC, was Dr. Nulph's employer as alleged in the complaint.

### C.     HHC's "City Call" Policy

The complaint incorrectly characterizes HHC's "city call" policy and incorrectly states the reasons why Dr. Nulph was removed from Perry Hospital by omitting several key facts.

A "city call" patient at Perry Hospital is one who does not have an existing relationship with a physician with privileges at the hospital. As a result, doctors from the community who do have privileges will work "city call" shifts to care for these patients. Complaint, ¶ 22. Perry Hospital often pays "*ApolloMD, local physicians, or other third parties* to secure 'city call' coverage in Perry Hospital's emergency department." Complaint, ¶ 25 (emphasis added). Importantly, the policy has nothing to do with whether a patient is insured or not.

In May 2021, HHC put into place a policy that, for at least the ten-day period between May 22 and June 1, 2021, all "city call" patients who reported to Perry Hospital's emergency department and needed admission were to be transferred to *larger and better equipped* medical facilities, including nearby Houston Medical Center, that could provide necessary care that Perry Hospital was not in a position to provide. Complaint, ¶¶ 28, 29. Houston Medical Center is located approximately 15 miles away from Perry Hospital and has approximately five times the number of beds, a larger medical staff, and a more robustly staffed ED. Complaint, ¶ 30.

When Dr. Nulph learned that HHC was implementing this policy, he apparently believed that the policy would necessarily result in numerous EMTALA violations. Complaint, ¶ 44. When the policy did in fact go into place, Dr. Nulph allegedly witnessed multiple patients (without identifying or providing how many or what condition they were in) being transferred from Perry Hospital to other facilities in a manner that he believed did not comply with EMTALA's provisions. Complaint, ¶ 45.

Dr. Nulph reported this information, both internally and externally, without specifying how HHC's "city call" policy violated EMTALA. In fact, the complaint's stated reason for Dr. Nulph reporting this information was that he "feared that this policy continuing in effect would cause serious harm to patients who were being inappropriately transferred, and worried that as ED Director, *he could be exposed to personal liability* for any violations resulting from this policy that he did not design or support." Complaint, ¶ 47 (emphasis added).

On the morning of May 24, 2021, Dr. Nulph electronically made a formal complaint through an online portal maintained by the Office of Inspector General ("OIG") for the Department of Health and Human Services ("HHS"), the federal agency tasked with enforcing EMTALA. Complaint, ¶ 48. Specifically, Dr. Nulph reported that Perry Hospital had enacted this policy, and that as a result of it, multiple

uninsured patients had been transferred out of Perry Hospital in violation of EMTALA's provisions. *Id*. Again, the complaint does not specify that any patients were insufficiently screened or improperly transferred in an unstable condition. There is likewise no contention that any patient suffered adverse consequences from a transfer during the "city call" timeframe.

HHC allegedly became aware that Dr. Nulph had filed his complaint with the OIG on the same day that the complaint was filed. Complaint, ¶ 50. The following day, Dr. Nulph was also allegedly informed by ApolloMD that "the shit [was] hitting the fan" at Perry Hospital and that HHC wanted him out of the hospital, which eventually lead to his removal from Perry Hospital. Complaint, ¶¶ 51, 52.

Importantly, the decision to remove Dr. Nulph was made by ApolloMD, Dr. Nulph's employer, not HHC. Also omitted from the complaint is that Dr. Nulph had a history of not complying with hospital policies, including violating the dress code, had previously engaged in conduct that jeopardized patient safety, including bringing his child to work while making rounds, and that nine patients had filed formal complaints against him with Perry Hospital's administrative staff, the most of any ED physician at Perry Hospital in 2021 to date. These behaviors caused both HHC and ApolloMD to lose confidence in Dr. Nulph as ED Director and resulted in his removal from Perry Hospital.

## III. LEGAL STANDARDS

### A. Standard Governing a Motion to Dismiss Pursuant to Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the plaintiff's claims. Specifically, dismissal is warranted when a party fails to state a claim upon which relief may be granted, i.e., if no relief could be granted under any set of facts that could be proved consistent with the allegations. *See* Fed. R. Civ. Pro. 12; *Twombly*, 550 U.S. at 563; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In *Twombly* and *Iqbal*, the Supreme Court held that in order to survive a motion to dismiss, a complaint must be plausible on its face, meaning that the plaintiff must have pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556, emphasis added).

Importantly, Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim *showing that the pleader is entitled to relief*." Fed. R. Civ. P. 8(a)(2) (emphasis added). Although a court is to "construe the complaint in the light most favorable to the plaintiff, accept his or her allegations as true, and draw all reasonable inferences in favor of the plaintiff, [a court is] not required to 'accept as true legal conclusions or unwarranted factual inferences.'" *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1331 (Fed.

Cir. 2012). Similarly, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *see also Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1260 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must state a claim with sufficient factual matter "that is plausible on its face." According to the Supreme Court:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief."

*Id.*

Furthermore, Rule 12(b)(6) allows trial courts to terminate lawsuits "that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Systems, Inc. v. Scimed Life Sciences Systems, Inc.*, 988 F.2d 1157, 1160-1 (Fed. Cir. 1993) (dismissal is proper where "there is no reasonable view of the facts which could support the claim"); *see also Port Authority of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 312 (3d Cir. 1999) (noting that Rule 12(b)(6) "is designed to screen out cases" where **no remedy exists** for the wrong alleged or

**where no relief could possibly be granted**) (emphasis added).

Finally, if a court finds that the plaintiff fails to state a claim for relief, the court may dismiss the claim with prejudice if an amended pleading would be futile. *See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1327 (Fed. Cir. 1998).

**B.     Standard Governing EMTALA's Whistleblower Protection Clause**

The EMTALA whistleblower protections apply to two types of whistleblowers, physicians, and hospital employees. Dr. Nulph does not allege he was "a physician who refuse[d] to authorize the transfer of an individual with an emergency medical condition that has not been stabilized." Instead, he alleges he was retaliated against because he reported "a violation of a requirement of EMTALA." This protection is expressly limited to hospital employees, and Dr. Nulph was not an employee of HHC. 42 U.S.C. § 1395dd(i)

EMTALA's whistleblower protections extend to *employees* if they can establish that they "[were] acting under a good faith, reasonable belief that a violation existed." *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 593 (3d Cir. 2018) (emphasis added). However, an EMTALA whistleblower, unlike a Fraud, Waste, and Abuse (FWA) whistleblower, cannot satisfy the statute by simply objecting to wrongful conduct. *David v. BayCare Health Systems, Inc.*, 2019 WL

6842085 (M.D. Florida, Tampa Division, 2019). Instead, EMTALA only protects employees who "refuse[d] to authorize the transfer of an individual with an emergency medical condition that ha[d] not been stabilized or . . . report[ed] a violation of a requirement of this section." *Id.*; 42 U.S.C. § 1395dd(i). To state a claim under EMTALA's whistleblower protections, a plaintiff must therefore allege sufficient facts to establish: (1) a good faith, reasonable belief that the defendant was engaged in a violation of EMTALA; and (2) that, as a result of the plaintiff's belief that the defendant committed an EMTALA violation, she either refused to authorize a discharge or transfer of the relevant patient or reported the violation. *Id.*

For example, a plaintiff's bare assertion that they "report[ed] violations of EMTALA, including failing to provide appropriate medical screenings to individuals that sought treatment in the emergency department due to understaffing" has thus been found to be "a mere conclusory allegation that directly tracks the language of the statute." *Id.*; *see also Franklin*, 738 F.3d 1246, 1250 (11th Cir. 2013); *Iqbal*, 566 U.S. at 678–79; *Twombly*, 550 U.S. at 570. Instead, plaintiffs must "plead facts that describe a violation of EMTALA and subsequent action by [them] in response to state a claim under EMTALA's whistleblower protections. *David* at 3.

## IV.  ARGUMENT

Although Dr. Nulph's complaint relies heavily on the background of the EMTALA and lists, almost verbatim, the obligations it imposes on hospital emergency departments, the complaint does not allege *how* HHC's "city call" policy at Perry Hospital violated EMTALA, nor does the plaintiff seek relief for any such violations under a standard *qui tam* action. Instead, the plaintiff's sole allegation is that HHC retaliated against him for engaging in "whistleblower activity" allegedly resulting in wrongful termination in violation of EMTALA's whistleblower protection clause. Specifically, Dr. Nulph incorrectly relies on 42 U.S.C. § 1395dd(d)(2)(A) and 42 U.S.C. § 1395dd(i) to establish a basis for relief that he is not entitled to. First, the "city call" policy did not violate EMTALA. Second, Dr. Nulph was not an "employee" of HHC and does not satisfy the essential elements entitling him to relief under 42 U.S.C. § 1395dd(i), EMTALA's whistleblower protection clause.

For these reasons, the complaint cannot state a plausible claim for which relief can be granted, and it should be dismissed with prejudice.

### A.  Dr. Nulph's Complaint Fails to Sufficiently Allege How HHC's "City Call" Policy Violated 42 U.S.C. § 1395dd.

The complaint fails to sufficiently allege how HHC's "city call" policy, relating to the transfer of patients from Perry Hospital to larger and better equipped

hospitals, including nearby Houston Medical Center, between May 22 and June 1, 2021, violated EMTALA. An EMTALA violation only exists where a hospital "either fails to adequately screen a patient or discharges or transfers the patient without first stabilizing the patient's emergency medical condition." *Kizzire v Baptist Health System Inc*., 441 F.3d 1306, 1310 (11th Cir. 2006). Dr. Nulph has not alleged and cannot establish that this happened with any patient when the "city call" policy was in effect.

The "city call" policy may have been inconvenient for some patients. It meant that some patients were admitted to Houston Medical Center and not Perry Hospital. EMTALA does not forbid a policy that mandates the transfer of patients who do not have a MD as long as they are properly screened and stabilized for transfer. "City call" does not mean uninsured or unable to pay, it simply means no MD on staff at Perry Hospital.

A policy that may lead to an EMTALA violation is not an EMTALA violation. Likewise, EMTALA can be violated without a "city call" policy. On the contrary, the plaintiff seeks no relief whatsoever for HHC's alleged violation of EMTALA relating to the "city call" policy because this policy did not violate EMTALA in the first place. Dr. Nulph has not and cannot identify any patient that was not properly screened or stabilized contrary to EMTALA.

19

**B.    Dr. Nulph is Not Entitled to Relief Under 42 U.S.C. § 1395dd(i)**

Dr. Nulph is not entitled to relief under 42 U.S.C. § 1395dd(i), EMTALA's whistleblower protection clause, either because: (1) he was not an "employee" of HHC, but instead an employee of ApolloMD; and (2) the complaint fails to allege sufficient facts to establish: (1) a good faith, reasonable belief that HHC was engaged in a violation of EMTALA; and (2) that, as a result of the plaintiff's belief that HHC committed an EMTALA violation, he either refused to authorize a discharge or transfer of the relevant patient or reported the violation.

First, the complaint acknowledges that Dr. Nulph worked at Perry Hospital through a placement by Houston County Emergency Group, LLC, a wholly owned subsidiary of ApolloMD. Complaint, ¶ 19. Specifically, ApolloMD had contracted with HHC to provide *outsourced physicians* to provide ED services to patients, and HHC was *not* a party to or a third-party beneficiary of the contract between Dr. Nulph and ApolloMD. Complaint, ¶ 20. Importantly, Dr. Nulph had signed an employment contract with ApolloMD only, not HHC, and neither HHC nor Perry Hospital paid Dr. Nulph's W-2 wages. Complaint, ¶ 59. Consequently, ApolloMD, not HHC, was Dr. Nulph's employer, and Dr. Nulph is therefore not entitled to relief under this provision.

Second, even if Dr. Nulph did qualify as an "employee" entitling him to relief, Dr. Nulph's complaint fails to satisfy the essential elements entitling him to relief under 42 U.S.C. § 1395dd(i). Again, EMTALA's whistleblower protections extend to employees if they can establish that they "[were] acting under a good faith, reasonable belief that a violation existed." *Gillispie*, 892 F.3d 858, 593 (3d Cir. 2018). However, an EMTALA whistleblower, unlike an FWA whistleblower, cannot satisfy the statute by simply objecting to wrongful conduct. *David*, 2019 WL 6842085 (M.D. Florida, Tampa Division, 2019).

Instead, EMTALA only protects employees who "refuse[d] to authorize the transfer of an individual with an emergency medical condition that ha[d] not been stabilized or . . . report[ed] a violation of a requirement of this section." *Id.*; 42 U.S.C. § 1395dd(i). To state a claim under EMTALA's whistleblower protections, a plaintiff must therefore allege sufficient facts to establish: (1) a good faith, reasonable belief that the defendant was engaged in a violation of EMTALA; and (2) that, as a result of the plaintiff's belief that the defendant committed an EMTALA violation, she either refused to authorize a discharge or transfer of the relevant patient or reported the violation. *Id*.

Although Dr. Nulph may have satisfied the first element, nowhere does he allege in the complaint that he refused to authorize a discharge or transfer of the

relevant patient, nor does he explain how HHC violated EMTALA in his complaint to the OIG. In fact, just as plaintiffs who insufficiently assert that they "report[ed] violations of EMTALA, including failing to provide appropriate medical screenings to individuals that sought treatment in the emergency department due to understaffing," have been denied relief for failing to state a claim, Dr. Nulph's assertion that he "witnessed multiple patients . . . who were suffering from 'emergency medical conditions' being transferred from Perry Hospital to other facilities in a manner that he reasonably and in good faith believed did not comply with EMTALA's provisions" (Complaint, ¶ 45)  is also a "a mere conclusory allegation that directly tracks the language of the statute." *David* at 3; *see also Franklin*, 738 F.3d 1246, 1250 (11th Cir. 2013); *Iqbal*, 566 U.S. at 678–79; *Twombly*, 550 U.S. at 570.  Instead, plaintiffs must "plead facts that describe a violation of EMTALA and subsequent action by [them] in response to state a claim under EMTALA's whistleblower protections," which Dr. Nulph has failed to do here. *Id*. As such, the complaint fails to satisfy the requirements set forth in Federal Rule of Civil Procedure 8(a)(2).

### C.   Dr. Nulph's Breach of Legal Duty Claim (COUNT II) Should Be Dismissed Because Dr. Nulph Has Alleged No Duty To Him Except EMTALA Whistleblower Protection, Which Does Not Apply.

O.C.G.A. § 51-1-6 provides:

> When the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby.

"O.C.G.A. § 51-1-6 is designed to allow recovery where a statutory breach is established, although the applicable statute does not expressly provide a cause of action." *Jairath v. Dyer*, 972 F. Supp. 1461, 1465 (N.D. Ga. 1997) (dismissing claim based upon O.C.G.A. § 51-1-6 and the federal Americans With Disabilities Act). "The language of OCGA § 51-1-6 … does not confer a separate cause of action in tort upon one who has suffered a breach of a legal or a private duty." *Parris v. State Farm Mut. Auto. Ins. Co.*, 229 Ga. App. 522, 524, 494 S.E.2d 244 (1997). Rather, it operates in conjunction with a statute that imposes a legal duty but does not expressly provide a cause of action. The code section only permits the recovery of damages for a breach of a legal duty. *City of Buford v. Ward,* 212 Ga. App. 752, 755, 443 S.E.2d 279 (1994).

Because Dr. Nulph cannot establish that he was entitled to whistleblower protection under EMTALA, any claim for relief under O.C.G.A. § 51-1-6 should be dismissed as well.

**D.     Dr. Nulph's Complaint Should Be Dismissed with Prejudice**

While parties are often given leave to amend to correct a pleading defect, Dr. Nulph should not be granted leave here. As established above, the complaint could not state a plausible claim for relief because there were no EMTALA violations and Dr. Nulph was not an "employee" of HHC capable of satisfying the essential elements provided in 42 U.S.C. § 1395dd(i) entitling him to relief.

Of particular significance is the fact that this Court recently granted another defendant's motion to dismiss pursuant to Rule 12(b)(6) in its decision in *Rehfeldt v. Compassionate Care Hospice Group et al.* (M.D. Georgia, Macon Division, 2021). In that case, the plaintiff had initially filed a *qui tam* action on behalf of the United States for violations of the False Claims Act (FCA), which the plaintiff voluntarily dismissed. The plaintiff's sole remaining claim, like Dr. Nulph's claim here, was for relief under the FCA's whistleblower protection clause, 31 U.S.C. § 3730(h), after he was terminated for reporting FCA violations. There, like here, the Court found that the plaintiff failed to satisfy the necessary elements entitling him to relief and therefore granted the defendants' motion to dismiss.

## V.     CONCLUSION

For the foregoing reasons, HHC respectfully requests that the Court dismiss the complaint, with prejudice.

This the 18th day of January, 2022.

Respectfully submitted,

*s/ Daniel J. Huff*
Daniel J. Huff
GA Bar No. 374860
Huff, Powell & Bailey, LLC
999 Peachtree Street, Suite 950
Atlanta, GA 30309
Ph: (404) 892-4022
Fax: (404) 892-4033
Email: dhuff@huffpowellbailey.com


Attorney for Defendant Houston
Healthcare System, Inc.

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day presented the within and foregoing DEFENDANT HOUSTON HEALTHCARE SYSTEM, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) in Times New Roman 14 point font to the Clerk of Court by filing and uploading to the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

|  |  |
|---|---|
| Jennifer K. Coalson, Esq. | David B. Ricks, Esq. |
| Robert J. Kozloski, Esq. | DAVID RICKS, ATTORNEY AT LAW |
| PARKS, CHESIN & WALBERT, P.C. | 27 Pierce Est. |
| 75 14th Street, 26th Floor | Hawkinsville, Georgia 31036 |
| Atlanta, Georgia 30309 | dbricks80@hotmail.com |
| jcoalson@pcwlawfirm.com | |
| rkozloski@pcwlawfirm.com | |

This the 18th day of January, 2022.

HUFF, POWELL & BAILEY, LLC

*/s/ Daniel J. Huff*

_____

DANIEL J. HUFF
Georgia Bar No. 374860
JULYE M. JOHNS-BAILEY
Georgia Bar No. 394856

999 Peachtree Street, Suite 950
Atlanta, Georgia 30309
(404) 892-4022
(404) 892-4033 (fax)

*Counsel for Defendant*