IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| RICK NULPH, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:21-cv-423 (MTT) |
| | ) |
| HOUSTON HEALTHCARE SYSTEM, INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER

Plaintiff Rick Nulph, M.D. filed this whistleblower retaliation action against Defendant Houston Healthcare System, Inc. ("HHC") alleging HHC terminated him for reporting violations of the Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd(i) ("EMTALA"). Docs. 1; 10. Dr. Nulph also asserts a derivative breach of legal duty claim under O.C.G.A. § 51-1-6, and he seeks attorney fees and costs pursuant to O.C.G.A. § 13-6-11. Doc. 10 ¶¶ 89-92. HHC moves for summary judgment on all claims, arguing (1) Dr. Nulph's EMTALA claim fails because he is not entitled to whistleblower protection under 42 U.S.C. § 1395dd(i) and (2) Dr. Nulph's breach of legal duty claim under O.C.G.A. § 51-1-6 fails because his EMTALA claim fails. Docs. 32; 32-2 at 13, 19-20. For the following reasons, HHC's motion (Doc. 32) is **GRANTED**.[1]

---

[1] Dr. Nulph's motion to exclude the testimony of Dr. Tyler W. Barrett (Doc. 31) is **TERMINATED** as moot.

## I. BACKGROUND[2]

**A. Factual Background**

Dr. Rick Nulph was the Emergency Department Director and a physician at Perry Hospital ("Perry"), which is owned and operated by HHC, from September 2017 until June 2021. Docs. 32-1 ¶ 2; 32-4 at 16:16-19; 33-2 ¶ 2. Dr. Nulph was not an HHC employee, but rather he was employed by ApolloMD, which contracted with HHC to provide emergency department services by outsourcing physicians to hospitals. Docs. 32-1 ¶¶ 1-4; 33-2 ¶¶ 1-4.

In May 2021, HHC implemented a temporary policy—the policy was in effect from May 22, 2021 to June 1, 2021—for Perry "city call" patients, who the parties define as patients without a primary care physician with privileges at Perry. Docs. 32-1 ¶¶ 5-6; 33-2 ¶¶ 5-6. This policy provided that Perry city call patients needing admission would be transferred to Houston Medical Center, a larger HHC facility located roughly 15 miles away. Docs. 32-1 ¶¶ 6-7; 33-2 ¶¶ 6-7; 32-5 at 62:9-23; 34-8 ¶ 9. Unhappy with the policy, Dr. Nulph complained. Those complaints constitute his alleged protected activity. Doc. 34 at 33-34. Because the allegations in Dr. Nulph's amended complaint about what he reported were not true, the Court briefly discusses those allegations before turning to Dr. Nulph's now revised account of his claimed protected activity.

---

[2] Unless otherwise stated, these facts are undisputed and are from the defendant's statement of facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*1. Dr. Nulph's alleged reports*

Dr. Nulph's initial *allegations* of the substance of his complaints were detailed and specific. He allegedly complained that the City Call Policy "resulted in multiple EMTALA violations that Dr. Nulph observed." Doc. 10 ¶ 43. He specifically alleged that he "witnessed multiple patients, including uninsured and indigent patients, who were suffering from emergency medical conditions being transferred from Perry Hospital to other facilities in a manner that he reasonably and in good faith determined did not comply with EMTALA's provisions." *Id.* ¶ 51. Upon observing these multiple violations, Dr. Nulph alleged that on May 24, 2021, he filed a formal complaint through an online portal maintained by the Office of Inspector General ("OIG") for the Department of Health and Human Services ("HHS"), the federal agency tasked with enforcing EMTALA. *Id.* ¶ 54. Dr. Nulph reported that Perry Hospital had enacted this policy, and that as a result of it, multiple uninsured patients had been transferred out of Perry Hospital in violation of EMTALA's provisions. *Id.*

*2. Dr. Nulph's actual reports*

Dr. Nulph's allegations that he observed and reported "multiple" EMTALA violations were not true, and he would not repeat those allegations under oath. *See generally* Doc. 32-4. Dr. Nulph did not observe any violations, and his protected activity did not include reports of EMTALA violations. Rather, his alleged protected activity boiled down to this. On May 22, 2021, the day the policy became effective, Dr. Nulph spoke with Perry's Chief of Staff, Dr. Soundappan. Docs. 32-4 at 26:10-12; 27:1-2; 32-5 at 68:15; 34-3 at 8 ¶ 4. Dr. Nulph "expressed concerns about the policy … [and] told Dr. Soundappan that he intended to file an EMTALA complaint in order to protect himself

3

from liability associated with this policy." Doc. 34-3 at 8. On May 24, 2021, Dr. Nulph "escalated his complaint" about the city call policy to the OIG by filing a formal complaint through an online portal maintained by the OIG.[3] Doc. 34 at 2; *see* Docs. 32-1 ¶ 8; 33-2 ¶ 8. Oddly, that report is not in the record. Doc. 40 at 21:6-14. But it is undisputed that Dr. Nulph did not, contrary to the allegations in his amended complaint, report that patients were transferred in violation of EMTALA, nor did he cite a specific patient incident that he believed to be an EMTALA violation; Dr. Nulph apparently did not even specify how the city call policy violated EMTALA. Docs. 34-3 at 8; 40 at 21:14-22:8; *see* Docs. 32-1 ¶¶ 9-10; 32-2 at 16; 33-2 ¶¶ 9-10. Rather, he reported the existence of the policy because he "might be implicated." Doc. 32-4 at 30:2-6. In the end, there were no EMTALA violations; rather as his lawyer put it at the motion hearing, Dr. Nulph now argues only that he "had a reasonable belief that the policy violated EMTALA."[4] Doc. 40 at 15:9-10.

On May 25, 2021, Dr. Nulph "was allegedly informed" by Josh Hargraves of ApolloMD that HHC "wanted him off the hospital's ED schedule, which eventually led to his removal from Perry Hospital." Docs. 32-1 ¶ 15; 33-2 ¶ 15. On June 2, 2021, HHC sent a formal letter to ApolloMD requesting Dr. Nulph's removal, citing his "inappropriate contact" with Dr. Soundappan regarding patient transfers and other behavioral issues

---

[3] Dr. Nulph also claims he "spoke on the telephone with Houston Healthcare's Chief Medical Officer Larry Stewart" on May 22, 2021, "about concerns [he] had raised … about the policy." Doc. 34-3 at 8. Dr. Nulph does not argue that this conversation was part of his protected activity. Doc. 34 at 12. In any event, that conversation did not differ materially from his conversation with Dr. Soundappan. Docs. 10 ¶¶ 51; 52; 34-3 at 8.

[4] Dr. Nulph's unfounded, over-the-top allegations raise concerns. However, the Court is confident that Dr. Nulph's attorneys share no responsibility for these allegations.

and patient complaints.  Docs. 32-6 at 85; 35-1 at 19 ¶ 17.  Dr. Nulph, of course, does not agree that these were the true reasons for his termination.

**B. Procedural History**

On November 19, 2021, Dr. Nulph filed this action against HHC, alleging he was terminated in retaliation for reporting HHC's city call policy in violation of 42 U.S.C. § 1395dd(i) and O.C.G.A. § 51-1-6.  Doc. 1.  On January 18, 2022, HHC moved to dismiss.  Doc. 4.  The Court denied HHC's motion and granted Dr. Nulph leave to amend his complaint to provide more detailed allegations of EMTALA violations, which he filed on May 23, 2022.  Docs. 9; 10.  HHC now moves for summary judgment on all claims.  Doc. 32.

## II. LEGAL STANDARD

A Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving

party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[]—that is, point[] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id*. at 1438 (quoting *Celotex*, 477 U.S. at 325) (alterations in original).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id*.

The burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact."  *Id*. (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), "the court may … consider the fact undisputed for purposes of the motion[.]"  Fed. R. Civ. P. 56(e)(2).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSION

HHC argues Dr. Nulph was not an employee of HHC and thus was not entitled to EMTALA whistleblower protection and that he did not engage in protected activity.

Docs. 32; 32-2 at 11-13.  HHC further argues that Dr. Nulph's claim under O.C.G.A. § 51-1-6 fails without a viable EMTALA claim.  Doc. 32-2 at 19-20.

**A. EMTALA Whistleblower Protections**

EMTALA generally requires hospitals with emergency departments (1) to provide an appropriate medical screening examination to all individuals who come to the emergency department, (2) to stabilize patients with emergency medical conditions, and (3) to follow specific guidelines for patient transfers if an emergency condition exists.  42 U.S.C. § 1395dd(a)-(c).  Generally, if the patient is suffering from an emergency medical condition, the hospital must stabilize the patient before attempting to transfer him elsewhere.  42 U.S.C. § 1395dd(c).  Under EMTALA's whistleblower protection provision,

> A participating hospital may not penalize or take adverse action against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or *against any hospital employee because the employee reports a violation of a requirement of this section*.

42 U.S.C. § 1395dd(i) (emphasis added).  Although EMTALA provides whistleblower protection for physicians, Dr. Nulph contends that for "purposes of EMTALA" he is an HHC employee, and he only invokes EMTALA's protection for "hospital employees" who report EMTALA violations.  Doc. 34 at 9.

Notably, the parties agree that EMTALA's whistleblower protections extend to hospital employees who can establish that they "[were] acting under a good faith, reasonable belief that a violation existed," even if no actual violation occurred.[5]  Docs.

---

[5] The parties' interpretation of EMTALA's scope is based on *Gillispie v. RegionalCare Hosp. Partners Inc*, 892 F.3d 858, 593 (3d Cir. 2018) ("As with Title VII claims, Gillispie need not prove an actual EMTALA

7

32-2 at 9; 34 at 11-12.  The Court is not so sure.  The plain language of the statute protects hospital employees who "report a violation" of EMTALA.  42 U.S.C. § 1395dd(i).  It might make sense that EMTALA's whistleblower shield should protect hospital employees who truly and reasonably, but mistakenly, believe they know of a violation.  Still, a reasonable argument could be made that the statutory text does not provide a shield that broad.  Nevertheless, for the purpose of this order, the Court accepts the parties' statutory construct and thus looks to see whether the record contains facts suggesting that Dr. Nulph reported what he reasonably and in good faith believed to be a violation of EMTALA.  But Dr. Nulph's interpretation of "reports a violation" strays even further from the text of the statute.  Because it is now clear that he did not report a violation—at best he reported there could be a violation—he argues that EMTALA protects a hospital employee who reports that a violation might happen.

1. *Dr. Nulph is not a hospital employee "for Purposes of EMTALA"*

The first question is whether Dr. Nulph is an HHC employee.  It is undisputed that Dr. Nulph is an employee of ApolloMD, and ApolloMD contracts with HHC to provide physician services, a common practice in the hospital industry.  Docs. 10 ¶ 21; 32-1 ¶¶ 1-4; 33-2 ¶¶ 1-4.  Because the facts, as they have turned out, preclude a physician retaliation claim,[6] Dr. Nulph argues that "hospital employee" should be read to include physicians.  Dr. Nulph argues that Georgia law supports this reading of the statute, citing Georgia's time, manner, and method test for evaluating the status of independent

---

violation.  Rather, she need only establish that '[s]he was acting under a good faith, reasonable belief that a violation existed.'") (alteration in original).

[6] EMTALA protects a physician who "refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized."  42 U.S.C. § 1395dd(i).  That did not happen here.

contractors.[7]  Doc. 34 at 9-10.  That argument fails for two reasons.  Georgia law is not relevant to the interpretation of the statute and even if it were, the time, manner, and method test does not confer employee status.  Rather, it is used to establish vicarious liability for an independent contractor's torts.

The plain text of the statute is clear.  EMTALA provides defined protections for physicians, on the one hand, and hospital employees on the other.  42 U.S.C. § 1395dd(i).  As a physician employed by a third party that provides physician services to HHC, Dr. Nulph is not an HHC employee.  Accordingly, his claim fails.

   *2. Dr. Nulph did not report an EMTALA violation*

The Court begins with what Dr. Nulph reported, the claimed protected activity.  Two days after the city call policy went into effect, Dr. Nulph reported to the OIG that the city call policy had a "high probability" of violating EMTALA.  Docs. 34 at 11-13; 34-8 ¶ 11.  Although the substance of what Dr. Nulph reported to the OIG (or to Dr. Soundappan the day the policy went into effect) is not in the record, Dr. Nulph's report to the OIG was based only on the city call policy itself; he did not refer to a specific violation of EMTALA and he did not cite any patients who he believed were improperly screened, stabilized, or transferred.  Doc. 40 at 21:14-22:8.  Nor did Dr. Nulph report how the policy violated EMTALA.  *Id.*  Having abandoned, wisely, his allegations that he reported "multiple" or even one violation of EMTALA, Dr. Nulph could only testify that

---

[7] *See Gray v. John R. Vaughn, M.D., P.C.*, 217 Ga. App. 872, 874 (1995); *see also Williamson v. Coastal Physician Servs. of Se., Inc.*, 251 Ga. App. 667, 668 (2001); *Employers Mut. Liab. Ins. Co. v. Johnson*, 104 Ga. App. 617, 620 (1961); *Rains v. Dolphin Mortgage Corp.*, 241 Ga. App. 611, 613 (1999).

"there were a couple patients that we transferred elsewhere that *we could have cared for at Perry*." [8]  Doc. 32-4 at 21:20-22 (emphasis added).

However, at the motion hearing, Dr. Nulph's counsel, with commendable candor, acknowledged that transferring patients who "otherwise would have been admitted" is not a violation of EMTALA.  Doc. 40 at 20:15-25.  In the end, as Dr. Nulph's counsel put it, Dr. Nulph's concerns were based on his belief that most city call patients were uninsured.  *Id.* at 17:4-18:5.  But transferring uninsured patients is not an EMTALA violation.  Rather, Dr. Nulph's theory, at best, is that a doctor might transfer a patient, and that patient might not be stable, and the doctor might not stabilize the patient before transfer.  Even if Dr. Nulph's theory, though dependent on several contingencies, was based on a good faith, reasonable belief about what might happen, it is undisputed that the city call policy itself did not violate EMTALA.  Again, EMTALA does not outlaw transfers.  Perry's "city call" policy simply required patients without a primary care physician at Perry Hospital to be transferred to a nearby sister hospital.  Docs. 10 ¶ 48; 32-6 at 77, 79.  The policy did not require Dr. Nulph to transfer patients in violation of EMTALA.  Thus, even if Dr. Nulph reasonably and in good faith believed that the city call policy, short term though it was, could somehow lead to a violation, Dr. Nulph's complaints about the mere existence of the city call policy, were not reports of an EMTALA violation.  *See Genova v. Banner Health*, 734 F.3d 1095, 1098-99 (2013).

---

[8] Nulph referred to two patients during his deposition, who appear to be the same two patients identified in Dr. Nulph's amended complaint as G.H. and M.M.  Docs. 10 ¶ 44; 40 at 6:17-24; *see* Doc. 32-4 at 22:24-23:20 (testifying that he may have transferred two patients under the city call policy identified in his written discovery responses as Gloria and Margaret).  But because Dr. Nulph could not recall anything about these two patients at his deposition, it is somewhat unclear if these two patients are the same as G.H. and M.M.

It perhaps is not necessary to address further whether Dr. Nulph's claimed protected activity was based on a reasonable, good faith belief that EMTALA violations had occurred. Again, he would not repeat those allegations under oath. But because he made those allegations, HHC produced patient charts for all 41 patients, including G.H. and M.M, transferred from Perry Hospital during the relevant time period, regardless of the reason for transfer.[9] Doc. 40 at 6:3-14, 15:17-20. Nothing in those records suggested that any patients, including the two patients identified by Dr. Nulph, were transferred without being properly screened or stabilized as required by EMTALA. *Id.* at 6:17-25, 15:17-18, 16:12-18. And when asked at his deposition, Dr. Nulph could not recall any details or specifics about G.H. or M.M or any other patients. Doc. 32-4 at 22:24-23:25. In other words, Dr. Nulph could not cite a single fact to support his claimed belief that patients were transferred in violation of EMTALA. *Id.* (testifying that he cannot recall anything about these two patients). There simply is no evidence to support a good faith reasonable belief that any patients were improperly screened, stabilized or transferred in violation of EMTALA.

In sum, when Dr. Nulph reported concerns about the city call policy, he did not report a violation of a requirement of EMTALA. 42 U.S.C. § 1395dd(i). At most, he reported his belief that the city call policy could somehow lead a physician to transfer patients who could be treated at Perry. However, it is undisputed that the city call policy did not violate EMTALA, that the transfer of patients who could be treated at Perry did not violate EMTALA, and that no EMTALA violation occurred. Nor is there evidence that supports a belief, in good faith, reasonable, or otherwise, that an EMTALA violation

---

[9] This would have included patients who needed specialized procedures available only at other facilities, as well as those without a primary care physician at Perry Hospital. Doc. 40 at 6:6-14.

occurred. *See Genova,* 734 F.3d at 1099 ("The statute Congress passed … permits suit only when the plaintiff … reported an *existing* EMTALA violation, not an i*mpending* one."). In short, Dr. Nulph did not engage in protected activity.

HHC's motion for summary judgment on Dr. Nulph's EMTALA claim (Doc. 32) is **GRANTED**.

**B. Breach of Legal Duty Under O.C.G.A. § 51-1-6**

HHC's final argument is that Dr. Nulph's claim under O.C.G.A. § 51-1-6 fails without a valid EMTALA claim. Doc. 32-2 at 21-22. O.C.G.A. § 51-1-6, "standing alone, creates no cause of action" but simply "authorizes the recovery of damages for the breach of a legal duty otherwise created." *Parris v. State Farm. Mut. Auto. Ins. Co.*, 229 Ga. App. 522, 524, 494 S.E.2d 244, 246 (1997). Dr. Nulph alleges HHC had a duty under EMTALA not to retaliate against him, HHC breached this duty which caused him harm, and thus he is entitled to relief under O.C.G.A. § 51-1-6. Doc. 10 ¶¶ 79-88. Because Dr. Nulph has not established that he is entitled to whistleblower protection under EMTALA, HHC argues he cannot claim a breach of legal duty based on EMTALA's whistleblower provision.[10] Doc. 32-2 at 21-22. The Court agrees.

O.C.G.A. § 51-1-6 requires a statutory breach, and without a valid EMTALA claim, there is no basis for Dr. Nulph's breach of legal duty claim. *Parris*, 229 Ga. App. at 524, 494 S.E.2d at 246. Thus, HHC's motion for summary judgment on Dr. Nulph's claim under O.C.G.A. § 51-1-6 (Doc. 32) is **GRANTED**.

---

[10] Dr. Nulph argues his claim under O.C.G.A. § 51-1-6 should be determined by a jury "because the whistleblower provision of U.S.C. § 1395dd was created to protect hospital employees who report violations of EMTALA" and "[he] can establish a claim against HHC [based on] his report of EMTALA violations." Doc. 34 at 19. This is Dr. Nulph's only argument against summary judgment.

12

## IV. CONCLUSION

For the foregoing reasons, Dr. Nulph is not entitled to EMTALA's whistleblower protections, and Dr. Nulph's claim under O.C.G.A. § 51-1-6 fails without a valid EMTALA claim. Accordingly, HHC's motion for summary judgment (Doc. 32) is **GRANTED**.

**SO ORDERED**, this 5th day of February, 2025.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
